RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ROSELYNE MARIKASI,

                              *Petitioner,*

      *v.*

LORETTA E. LYNCH, Attorney General,

                              *Respondent.*

No. 16-3281

On Petition for Review from the
Board of Immigration Appeals.
No. A 096 155 535.

Decided and Filed:  October 20, 2016

Before:  KEITH, McKEAGUE, and WHITE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Larisa I. Schneider, Florence, Kentucky, for Petitioner.  Alexander J. Lutz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

### OPINION

_____

DAMON J. KEITH, Circuit Judge.  Petitioner Roselyne Marikasi ("Marikasi") appeals the decision of the Board of Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of her asylum petition.  On August 20, 2014, an IJ denied Marikasi's application for asylum, withholding of removal under the Immigration and Nationality Act ("INA") 8 U.S.C. § 241(b)(3) and withholding of removal pursuant to the Convention Against Torture ("CAT").  The IJ determined that Marikasi was not a credible witness due to inconsistencies in her testimony and her failure to sufficiently corroborate her claims.  The BIA affirmed the IJ's denial

of Marikasi's applications for asylum and withholding of removal on all counts and ordered Marikasi removed to her native country of Zimbabwe. Marikasi timely appealed the BIA's decision on March 24, 2016. *See* 8 U.S.C. § 1252(b)(1).

For the following reasons, we **AFFIRM** the decision of the BIA.

## I.    BACKGROUND

Marikasi, a native citizen of Zimbabwe, legally entered the United States on January 19, 2002 on a non-immigrant visitor's visa with an expiration date of July 18, 2002. On November 25, 2002, Marikasi filed a form I-589 application for asylum and withholding of removal. Since she had overstayed her visa, her application was referred to the Immigration Court, and on September 25, 2003, the Department of Homeland Security commenced removal proceedings alleging that she was in violation of the INA, 8 U.S.C. § 1227(a)(1)(B). On July 11, 2005, Marikasi filed an amended Form I-589 application for asylum and withholding of removal.

In her initial application from 2002, when asked whether she had suffered from harm or mistreatment in the past, Marikasi stated the following:

> I got married to a very abusive husband it all started when I kept having miscarriages and that was when beatings and death threats started from a man I was living woth [sic] everyday [sic]. He use [sic] to sleep with a knife under the pillow and he was accusing me of cheating on him and I was causing all the miscarriages.

She did not check the box provided for "political opinion" as a reason for seeking asylum, but instead checked "nationality" and "membership in a particular group." This initial application made no mention that her husband was a government agent in Zimbabwe or that she or her husband were members of any political party. In the portion of the application that asked whether Marikasi had been a member of any organization, such as a political party in Zimbabwe, she mentioned only the Musasa Project for battered women.

In the 2005 amended application for asylum, Marikasi provided a different answer. In this application, when asked whether she had suffered from harm or mistreatment in the past, Marikasi stated:

I was tortured and mistreated by my husband who was a Government agent [in Zimbabwe] and by members of the ZANU PF [the leading party] because I belonged to the Movement for Democratic Change (MDC) [the opposition party]. My brother was brutalized and killed in 2002 by ZANU PF members because of my political activities in the MDC.

This time, Marikasi checked the box provided for "political opinion," "membership in a particular group," and "torture convention" as reasons for seeking asylum, but did not check the box for "nationality." In response to the question concerning whether she had been involved in any organizations, such as a political party, Marikasi stated that she belonged to the MDC, Movement for Democratic Change in Zimbabwe and actively organized meetings, campaigns, and rallies.

Following the submission of these asylum applications and several corroborating documents, a hearing was first held before an IJ in 2006. The IJ found that Marikasi was not a credible witness. The IJ said her story "developed wings," transitioning from a battered wife's story of domestic abuse at the hands of her husband to a political asylum story from an anti-government activist. As such, the IJ denied Marikasi's claim for asylum due to its lack of credibility and deemed her removable.

On appeal in 2011, the BIA remanded the case for further factual development regarding Marikasi's claim of domestic abuse.

Following remand in 2014, an IJ once again denied Marikasi asylum and withholding of removal under the INA and CAT. The 2014 IJ made the following findings concerning Marikasi's testimony: (1) Marikasi was inconsistent regarding the number of times she went to the hospital, when she went to the hospital, and what caused her husband to beat her so badly she had to go to the hospital; (2) Marikasi was inconsistent with regard to whether she reported the abuse she suffered; (3) Marikasi was inconsistent regarding her involvement with the Musasa Project for battered women; (4) Marikasi's testimony that she went into hiding from her husband in either April 2001 or October 2001 was inconsistent with evidence in both her initial asylum application and her amended asylum application; and (5) Marikasi was inconsistent in describing the reason or reasons why her husband would abuse her. Because domestic abuse was the

central reason for her asylum application, the 2014 IJ held that her inconsistencies, and her stated explanations for them, warranted an adverse credibility determination.

In addition, the 2014 IJ held that Marikasi did not sufficiently corroborate her claims to meet her burden of proof on the issue of past persecution. Relevant corroborating documents included a medical record showing that there was a "scuffle" with her husband, an affidavit from a former co-worker to whom Marikasi confided regarding the alleged domestic abuse, a letter from an American psychologist reporting anxiety related to domestic abuse and a diagnosis of Post-Traumatic Stress Disorder ("PTSD"), and a letter from a doctor in Zimbabwe reporting "political violence" she allegedly suffered in 2001. The BIA affirmed the IJ after according limited weight to the individualized evidence of corroboration proffered by Marikasi.

The 2014 IJ, however, made the following determinations in Marikasi's favor: (1) the Zimbabwean government is unable or unwilling to control domestic violence, and (2) women who suffer from domestic violence in Zimbabwe at the hands of a domestic partner and are unable to leave are sufficiently "particular" and therefore meet the requisite "social distinction" for asylum purposes. However, the 2014 IJ found that Marikasi was unable to demonstrate that her status in the domestic relationship with her husband was or is immutable because she could not show that she was unable to leave the abusive relationship and therefore failed to show that she was a member of this "particular social group."

Next, the 2014 IJ held that Marikasi also did not meet the higher burden of proof for showing fear of future persecution. Similarly, the 2014 IJ found that she could not meet the higher burden required for withholding of removal under the INA or CAT.

Marikasi appealed the 2014 IJ decision to the BIA, which affirmed the IJ and dismissed the appeal. The BIA concluded that the 2014 IJ's adverse credibility determination was not clearly erroneous. The BIA also agreed that Marikasi failed to present sufficient corroborative evidence to rehabilitate her discredited testimony or independently satisfy her burden of proof. Further, it held that Marikasi waived the issue of whether she could avoid future persecution by relocating to another part of Zimbabwe and that she was not a member of an immutable group

based on marital status because she did not show that she was unable to leave the marital relationship.  Accordingly, the BIA dismissed the appeal.

## II.      DISCUSSION

### A.  Jurisdiction and Standard of Review

This court has jurisdiction to review a final order of removal from the BIA pursuant to 8 U.S.C. § 1252. "The agency's findings of fact are reviewed for substantial evidence, and questions of law are reviewed de novo." *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012) (citing *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009)).  "The BIA's decisions are final agency determinations for purposes of judicial review, and we are also empowered to review the IJ's opinion to the extent that the BIA adopts that opinion." *Gaye v. Lynch*, 788 F.3d 519, 526 (6th Cir. 2015).

"Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. I.N.S.*, 388 F.3d 924, 925 (6th Cir. 2004) (citing *Yu v. Ashcroft*, 364 F.3d 700 (6th Cir. 2004)).  "This is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Id.* (internal quotation omitted).  Rather, findings of fact, such as adverse credibility determinations, are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Liti v. Gonzales*, 411 F.3d 631, 636 (6th Cir. 2005) (quoting *Yu*, 364 F.3d at 702).  However, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim." *Id.* at 637 (quoting *Sylla*, 388 F.3d at 926).[1]  Adverse credibility determinations "cannot be based on an irrelevant inconsistency." *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n. 2 (6th Cir. 2004).  "If discrepancies cannot be viewed as attempts by the applicant to enhance [her] claims of persecution, they have no bearing on credibility." *Id.*

---

[1]We note that there is a new standard of review for credibility determinations, which was created by the REAL ID Act of 2005.  Under the REAL ID Act, considering the totality of the circumstances and all relevant factors, a fact finder in an asylum claim may base an adverse credibility determination on an inconsistency, regardless of whether the inconsistency goes to the "heart of the claim." 8 U.S.C. § 1158 (b)(1)(B)(iii).  However, when an application for asylum is filed before May 11, 2005, the REAL ID Act of 2005 does not apply. *See Abdurakhmanov*, 735 F.3d at 345 n.3.  Here, Marikasi's application for asylum was filed in 2002.  Thus, the inconsistencies on which the adverse credibility determination was made must go to the "heart of the applicant's claim." *See Sylla*, 388 F.3d at 926.

at 623 (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).  Even where several inconsistencies cited by the IJ are irrelevant or do not go to the heart of the applicant's asylum claim, only one relevant inconsistency is required to uphold an adverse credibility determination. *See Sy v. Holder*, 337 F. App'x 487, 495 (6th Cir. 2009).

### B.  Legal Standard

Under the INA, "the Attorney General may grant asylum to an alien who has applied for asylum" if it is determined that "such an alien is a refugee."  8 U.S.C. § 1158 (b)(1)(A). The applicable definition for refugee includes a person away from her home country "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* § 1101(a)(42)(A).  When interpreting the INA, this court defers to the BIA's judgment.  *Castellano-Chacon v. I.N.S.*, 341 F.3d 533, 546 (6th Cir. 2003) ("we recognize the deference due the BIA's interpretation of the INA insofar as it reflects a judgment that is peculiarly within the BIA's expertise") *holding modified on other grounds by Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir. 2006).

"The burden of proof is on the applicant to establish that the applicant is a refugee[.]" 8 U.S.C. § 1158(b)(1)(B)(i).  This burden can be carried "'either because [s]he has suffered actual past persecution or because [s]he has a well-founded fear of future persecution.'" *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 389 (6th Cir. 1998) (quoting 8 C.F.R. § 208.13(a)-(b) (1997)).  "The applicant's testimony, if credible, 'may be sufficient to sustain the burden of proof without corroboration.'" *Id*. (quoting 8 C.F.R. § 208.13 (a) (1997)).  If past persecution is shown, "[a]n applicant . . . [establishing] such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim."  8 C.F.R. § 208.13(b)(1).

The INA does not define persecution, but this court has held that it "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) (internal quotation omitted).  We have interpreted "persecution" to require "physical punishment, infliction of harm, or significant

deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390. Further, persecuted individuals are those who are "specifically targeted by the government for abuse based on a statutorily protected ground and . . . not merely a victim of indiscriminate mistreatment." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005).

Likewise, membership in a "particular social group" is statutorily undefined, "but several [BIA] decisions have refined and articulated the requirements to include: (1) a shared immutable or fundamental characteristic; (2) social visibility; (3) particularity; and (4) the group cannot be defined exclusively by the fact that its members have been subject to harm." *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011) (internal quotation and citations omitted).

## III.    ANALYSIS

### 1)  Adverse credibility determination

Marikasi challenges each of the inconsistencies on which the 2014 IJ based the adverse credibility determination. Because only a single relevant inconsistency that goes to the heart of the applicants claim, and that "plausibly could be viewed as incredible" or "could be viewed as inconsistent" need support an IJ's adverse credibility determination, we will not review each of these in detail. *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004); *see also Sy*, 337 F. App'x at 495. We conclude that Marikasi's inconsistent statements provide substantial evidence on the record that "plausibly could be viewed as incredible" or "could be viewed as inconsistent."

Regarding whether any of these inconsistencies are relevant and go to the heart of Marikasi's claim, "[i]f discrepancies cannot be viewed as attempts by the applicant to enhance . . . claims of persecution, they have no bearing on credibility." *Daneshvar*, 355 F.3d at 623. The hospitalizations recounted by Marikasi were allegedly caused by either her husband's abuse or a group of pro-government youths who attacked Marikasi for organizing a political opposition rally. The BIA found that Marikasi was inconsistent regarding the number of times she was hospitalized, the dates of her hospitalization, and the reasons for the abuse that led to the hospitalization. Marikasi also did not mention being hospitalized in her initial asylum application. Her asylum claim is based on abuse from her husband, who she alleged was a Central Intelligence Officer for the leading party in Zimbabwean government, the ZANU-PF.

Marikasi's initial asylum application alleged persecution based on "membership in a particular social group," and her amended asylum application alleged persecution on basis of "political opinion." These hospitalizations can be viewed as attempts to "enhance [her] claims of persecution" because evidence of hospitalization can show the "physical punishment, infliction of harm, or significant deprivation of liberty" required in the context of an asylum claim. *Mikhailevitch*, 146 F.3d at 390. If credible, hospitalizations resulting from Marikasi's domestic abuse or her political activities would bolster her asylum application and thus her inconsistencies concerning those hospitalizations go to the heart of her claim. Accordingly, we find that substantial evidence on the record supported an adverse credibility determination in this case and we will not disturb those findings on appeal.

Additionally, we agree with the BIA that other important factual inconsistencies between Marikasi's asylum application and her testimony supported an adverse credibility determination. In Marikasi's initial asylum application, she reported the following:

> I got married to a very abusive husband it all started when I kept having miscarriages and that was when beatings and death threats started from a man I was living woth [sic] everyday [sic]. He use [sic] to sleep with a knife under the pillow and he was accusing me of cheating on him and I was causing all the miscarriages.

Yet, as the BIA noted, Marikasi claimed in her declaration and testimony upon remand that her husband physically abused her and she *subsequently* suffered two miscarriages. This differs significantly from the claim in her first asylum application that the miscarriages predated the abuse. This inconsistency in the timeline of domestic abuse is relevant and at the heart of Marikasi's asylum claim because domestic abuse forms the very basis for her claim. It is of no moment that Marikasi expressed varying reasons as to *why* her husband abused her. Yet, alarm bells rightly toll on account of her variant stories as to *when* such tragic miscarriages transpired. Thus, Marikasi's testimony surrounding her miscarriages "plausibly could be viewed as incredible" and support IJ's adverse credibility determination. *Pilica*, 388 F.3d at 954.

**2) Corroborating evidence**

The BIA concluded that Marikasi did not present sufficient corroborative evidence to rehabilitate her discredited testimony or independently satisfy her burden of proof. Marikasi raises several arguments in response to this determination.

First, Marikasi claims that the BIA ignored the medical records reflecting Petitioner's hospitalization in 1999 resulting in her miscarriage due to her beating by her husband. However, this claim is without merit. In regard to the 1999 medical records, the IJ found that the records corroborated only the fact that Marikasi was abused by her husband in 1999, but failed to provide sufficient details to allow the court to determine that the abuse qualified as persecution under asylum standards. Considering that, oddly, Marikasi failed to discuss the account of the abuse in 1999 in her initial application or her 2006 hearing, we agree that this medical record, which reported a "scuffle at home with her husband," does little to corroborate domestic abuse rising to the level of persecution, which requires evidence of physical punishment, infliction of harm, or significant deprivation of liberty. *Mikhailevicht*, 146 F.3d at 390. Nor does the medical record clear up the credibility concerns stemming from Marikasi's inconsistent statements.

In her remaining arguments concerning corroboration, Marikasi essentially argues that the corroborating evidence should have been afforded more weight. However, the role of this court is not to weigh the evidence. *See Gray v. SLC Coal Co.*, 176 F.3d 382, 387 (6th Cir. 1999) (stating that "[w]e should not re-weigh evidence or substitute our judgment for that of the [factfinder]"). Our role here is to ensure that substantial evidence on the record supported the BIA's fact-finding. In this regard, the letters, affidavits, and reports cited in Marikasi's brief do not sufficiently corroborate her underlying asylum claim because they fail to fill significant, relevant gaps in her testimony.

Additionally, Marikasi cites to a Third Circuit case, *Fiadjoe v. Attorney Gen. of U.S.*, 411 F.3d 135, 137 (3d Cir. 2005), to argue the impact that PTSD can have on the accurate testimony of women who have been subjected to domestic or sexual violence. However, comparison to this case is inapposite. *Fiadjoe* involved a victim later recalling sexual abuse from when she was seven years old. *Id.* at 137. The adverse credibility determination in that

case turned in part on allegedly improper conduct by the IJ at her hearing. *See id*. at 155. In addition, some of the inconsistencies were based on testimony that was given to an INS officer in the airport very shortly after she suffered abuse. *Id*. at 159. Marikasi had a significant amount of time—almost a year—between her arrival in the United States and filling out her asylum application, and she claims no partiality or abuse on the part of the IJ. Further, her psychologist's note provides no particularized explanation for how PTSD played a role in Marikasi's varying accounts of the events in Zimbabwe. Thus, none of the pressures or circumstances that existed in *Fiadjoe* are present here, and the BIA did not err in finding that Marikasi failed to corroborate a litany of outstanding inconsistencies in her statements.

### 3) Past Persecution - "Particular social group"

Lastly, Marikasi contests the IJ and BIA determination that she did not meet the standard for an abused spouse seeking asylum. Under the INA, a refugee includes a person away from her home country "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014), the BIA reviewed the issue of whether spouses escaping an abusive domestic relationship can obtain asylum on refugee grounds and concluded in the affirmative.

This court has held that a "particular social group" is a group of individuals who share a common, immutable characteristic that is one that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. *Umana-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013); *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011). The group may not be circularly defined by the fact that it suffers persecution, and the group must be both particular and socially visible. *Umana-Ramos*, 724 F.3d at 671. In this case, the BIA determined that, while victims of an abusive domestic relationship can qualify as a particular social group, Marikasi did not prove that she was part of a group with the requisite common, immutable characteristic. We agree.

"Marital status" is an immutable characteristic when the "the individual is unable to leave the relationship."[2] *Matter of A-R-C-G-*, 26 I. & N. Dec. at 392. As further explained:

> A determination of this issue will be dependent upon the particular facts and evidence in a case. A range of factors could be relevant [in a domestic abuse situation], including whether dissolution of a marriage could be contrary to religious or other deeply held moral beliefs or if dissolution is possible when viewed in light of religious, cultural, or legal constraints.

*Id.* at 393.

The BIA distinguished Marikasi's case in the following important respects from *Matter of A-R-C-G-*: (1) when Marikasi went into hiding with the Musasa Project, she did not have any contact with her husband; (2) after she left the Musasa Project, she stayed with friends and never returned to her husband; (3) a substantial period of time had passed since Marikasi went into hiding and she remained out of contact with her husband; and (4) she remained out of contact with her husband after leaving Zimbabwe. In addition, we note that because of her ability to freely move through the country and avoid her husband, Marikasi failed to substantiate any religious, cultural, or legal constraints that prevented her from separating from the relationship in Zimbabwe or moving to a different part of that country.[3] *See Matter of A-R-C-G-*, 26 I. & N. Dec. at 393. Furthermore, Marikasi's case illustrates that she had a substantial network of family, friends, and co-workers who showed willingness and ability to help her within Zimbabwe and she did not credibly show any particular actions or complicity by the government which would have rendered her unable to avail herself of that country's protection.

Thus, Marikasi failed to carry her burden because she failed to prove that she could not leave the relationship or that she could not relocate to another part of Zimbabwe.

---

[2]At least one sister circuit has utilized this analysis in a domestic abuse asylum claim. *Vega-Ayala v. Lynch*, No. 15-2114, 2016 WL 4205890, at *3 (1st Cir. Aug. 10, 2016) (denying petition for review because petitioner, who was not married to the abusive man, could not prove immutability or social distinction).

[3]We note that this analysis is based on Marikasi's demonstrated ability to escape the abusive relationship and survive safely *within* her native country. The facts of *Matter of A-R-C-G-* dictate that asylum applicants who allege that they cannot leave the relationship under this rule are not precluded from relief merely because they were able to escape the relationship and arrive in the United States. The petitioners in *Matter of A-R-C-G-* were "natives and citizens of Guatemala who entered the United States without inspection." *Id.* at 389. Thus, it would be inappropriate to use the fact that Marikasi was able to escape her country and arrive in the United States to defeat her asylum claim, as this undercuts the very purpose of asylum.

**4) Fear of Future Persecution**

Having found that Marikasi did not show past persecution, consequently, there is no presumption that she faces a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1)(ii); *see also Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (stating that where an applicant proves past persecution, "there is a presumption of a well-founded fear of future persecution"). Marikasi argues that the burden of proof was improperly placed on her by the BIA. However, because we agree with the BIA that she has not shown past persecution, the burden is properly on her to show future persecution. *Mikhailevitch*, 146 F.3d at 390.

Having made a determination that Marikasi has not suffered past persecution, we must determine whether the evidence would compel a reasonable factfinder to conclude that there is a reasonable possibility of Marikasi suffering future persecution if she were to return to Zimbabwe. *Id.*; 8 C.F.R. § 1208.13(b)(2)(i)(B). Our inquiry requires reasonably specific information showing a "real threat of *individual* persecution," and a general, speculative assertion of fear is not enough to compel such a conclusion. *Mapouya*, 487 F.3d at 412 (emphasis added). Marikasi cites primarily to a State Department Report that discusses the difficulties the government of Zimbabwe has with controlling domestic violence in support of her claim. This report, however, does not support Marikasi's individual claim of persecution. Further, despite her general expression of fear that her husband will resume the abuse upon her return, Marikasi failed to explain why she cannot move to another part of Zimbabwe, where she could avoid contact with her husband. *See* 8 C.F.R. § 1208.13(b)(2)(ii). Therefore, we are not compelled to conclude that the BIA erred in failing to find a reasonable probability of future persecution.

For the aforementioned reasons, we affirm the BIA's determination that Marikasi's has not met her burden of proof to establish eligibility for asylum.

**5) Withholding of Removal**

Because Marikasi has not met her burden of proof on her eligibility for asylum, she accordingly cannot satisfy the more demanding standard that there is a clear probability of persecution required for withholding of removal under the Act. *Liti*, 411 F.3d at 641.

## III.    Conclusion

For the foregoing reasons, we **AFFIRM** the order of the BIA.